IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CESAR ALFARO and KARINA ALFARO,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>SELECT PORTFOLIO SERVICING, INC. and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR TOWD POINT MORTGAGE TRUST 2017-1,<br><br>　　　　　　　　　　　Defendants. | Civil Action No. 1:22-cv-192 |

## COMPLAINT

Plaintiffs Cesar Alfaro and Karina Alfaro, by counsel, file this Complaint against Defendants Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank National Association, as Trustee for Towd Point Mortgage Trust 2017-1 (U.S. Bank") (together, "Defendants"). In support of their Complaint, Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1. Plaintiffs bring this lawsuit against Defendants for charging unlawful fees and engaging in abusive servicing practices.

2. As a mortgage servicer, SPS handles the day-to-day management of home loans. It responds to borrower inquiries, manages escrow accounts, and—as relevant here—assesses fees and processes payments. SPS's authority to assess fees is based solely on the underlying agreement between borrower and lender. Thus, SPS's management of a particular home loan must accord with the operative document governing that loan, like a Deed of Trust.

3. SPS, nonetheless, routinely charges borrowers fees not referenced in or contemplated by the borrower's underlying agreement with the lender. This is especially problematic because borrowers do not *choose* to do business with SPS. Indeed, home loans are assigned to SPS without borrower assent. Put differently, when servicing home loans, SPS unilaterally decides what fees to charge borrowers and when to charge them. Naturally, SPS's choices are driven by its desire to maximize profits.

4. Here, SPS charged Plaintiffs fees not agreed to under the Deed of Trust or any other instrument. Specifically, SPS charged Plaintiffs fees for merely paying by telephone or online and defaulted-related fees—such as inspection fees and broker price opinion fees—even when no default had taken place.

5. SPS's add-on fees breached Plaintiffs' Deed of Trust because SPS forced Plaintiffs to pay more than they were contractually obligated to pay. The Deed of Trust simply does not permit the assessment of fees based on method of payment and it does not allow default-related fees when a borrower is in default.

6. On the other hand, the Deed of Trust allows fees in limited circumstances, such as in the event a borrower makes payment late. By charging fees beyond those specific fees allowed by the Deed of Trust, SPS functionally rewrote the contract at *its discretion* for *its benefit*. Indeed, SPS received an undeserved windfall from the add-on fees charged to and paid by Plaintiffs.

7. As a result, Plaintiffs seek to recover actual damages for SPS's breach of the Deed of Trust or, in the alternative, for unjust enrichment.

8. Plaintiffs also seek damages under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617. SPS violated the RESPA when, in response to Plaintiffs' qualified written requests, it refused to provide Plaintiffs with information relating to the bases for

its add-on fees. SPS's woefully deficient responses to Plaintiffs' qualified written requests concealed SPS's abusive practices. SPS also violated the RESPA when it neglected to correct its errors by reimbursing Plaintiffs for the unlawful fees.

9. RESPA and its implementing rules were designed to deter and prevent the kind of conduct exhibited by SPS in this case. RESPA's protections, including § 2605(e), were designed to ensure that borrowers have timely access to ensure transparent and accurate mortgage servicing practices. SPS's noncompliance with RESPA defeated the consumer protection purposes of RESPA and prevented Plaintiffs from obtaining information that would have exposed SPS' abusive and illegal servicing practices. Plaintiffs, accordingly, allege individual claims against SPS for its numerous violations related to its duties under RESPA, 12 U.S.C. § 2605.

## JURISDICTION AND VENUE

10. This Court has federal question jurisdiction over Plaintiffs' RESPA claims under 28 U.S.C. § 1331 and 12 U.S.C. § 2605(f). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the unlawful practices are alleged to have been committed in this District as Plaintiffs reside in this District.

## PARTIES

12. Plaintiffs are natural persons residing in this District and Division.

13. SPS is a foreign company authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia. At all times relevant to this Complaint, SLS was a mortgage loan servicing company governed by RESPA.

## FACTS

### *SPS's Mortgage Servicing Business*

14. SPS is a mortgage servicer that specializes in servicing subprime single-family mortgages.[1]

15. SPS contracts with mortgage lenders, like U.S. Bank, who own the mortgage loan. As the servicer, SPS is then responsible for managing the day-to-day aspects of consumers' mortgage loans, like creating and sending monthly statements to borrowers, collecting and processing payments, ensuring that the mortgaged property is insured, processing property tax payments, reporting payment information to various credit bureaus, and managing the foreclosure process when a consumer becomes delinquent.

16. As is customary in the mortgage lending, a borrower, like Plaintiffs, have no say in who services their mortgage loan. Therefore, consumers are especially vulnerable to servicers who mismanage mortgage loans because they are locked into a relationship with the company; in order to stay in their homes, the consumer must deal with the company as long as it remains their servicer, regardless of how it treats them or deals with their loan.

17. Upon information and belief, a significant portion of SPS's revenue is the assessment and collection of fees from borrowers, including late fees, foreclosure fees, and other

---

[1] According to the CFPB, "A subprime mortgage carries an interest rate higher than the rates of prime mortgages. Prime mortgage interest rates are the rates at which banks and other mortgage lenders may lend money to customers with the best credit histories. Prime mortgages can be either fixed or adjustable rate loans. More often, subprime mortgage loans are adjustable rate mortgages (ARMs). A subprime mortgage is generally a loan that is meant to be offered to prospective borrowers with impaired credit records. The higher interest rate is intended to compensate the lender for accepting the greater risk in lending to such borrowers. The interest rate on subprime and prime ARMs can rise significantly over time." https://www.consumerfinance.gov/ask-cfpb/what-is-a-subprime-mortgage-en-110/ (last visited Dec. 9, 2021).

default-related fees. Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, Georgetown Law and Economics Research Paper No. 11-01 (Dec. 15, 2010) at 41 (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1324023).

18. Under most servicing agreements, SPS is allowed to keep all of these fees for itself and does not have to pay them to the owner of the mortgage. *Id.*

19. These ancillary fees are highly profitable for mortgage servicers. For example, in 2007, Ocwen reported nearly 15% of its servicing income (or almost $59 million) was earned from late fees and other loan collection fees. *Id.* at 42 (citing Ocwen Fin. Corp., Annual Report (Form 10-K) 27 (Mar. 13, 2008), available at http://www.sec.gov/Archives/edgar/data/873860/000101905608000419/ocn10kO7.htm.)

20. In addition, in 2006, Countrywide, the largest servicer at that time, reported $285 million in revenue solely from late fees alone, representing nearly 10% of its total servicing operating revenue. These fees were enough to cover its entire servicing operating costs, leaving its servicing fees and float income as pure profit. *Id.* (internal citations omitted).

21. Traditionally, these fees have been limited to borrowers who pay their mortgages late or who are delinquent on their loans.

22. SPS, however, has found another way to earn these fees from borrowers who are not late or delinquent on their loans—by charging borrowers up to $15 each time that they want to pay their mortgage over the phone or internet.

23. These fees are charged even though a borrower is not late or seeking to make an expedited payment on their loan, and the only way that a borrower can avoid these fees is to mail their monthly payment—risking delay or non-delivery through the post office—or by setting up automatic payments—which, particularly for low-income consumers likely to have a subprime

mortgage, could lead to overdraft and insufficient fund fees.[2]

24. Even worse, SPS grossly inflates the fee well above what it actually costs to process an online payment. Upon information and belief, SPS uses a third-party processor for online payments and pays less than $1 for each online payment. However, it charges consumers $15 for each online or phone payment that they make.

### *Plaintiffs Obtain a Mortgage*

25. Plaintiffs purchased their home in Leesburg, Virginia on November 30, 2004.

26. As part of the purchase, Plaintiffs obtained a mortgage loan for $428,000.

27. The mortgage loan was secured by a Deed of Trust. (Attached as Exhibit 1.)

28. U.S. Bank is the current note holder of Plaintiffs' loan.

29. SPS become the servicer of Plaintiffs' loan in mid-2015.

30. Upon information and belief, SPS serviced Plaintiffs' loan under a servicing agreement with U.S. Bank. As a result of this servicing agreement, SPS was acting as U.S. Bank's agent.

### *Fees Permitted Under the Deed of Trust*

31. As relevant here, the Uniform Covenants of the Deed of Trust provide for the "Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges." (Ex. 1, ¶ 1.) Specifically, "Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note." "Borrower shall also pay funds for Escrow Items pursuant to Section 3." (*Id.*)

---

[2] *See* https://www.creditkarma.com/advice/i/automatic-bill-payment (last visited Dec. 9, 2021); https://www.consumerfinance.gov/about-us/blog/you-have-protections-when-it-comes-to-automatic-debit-payments-from-your-account/ (last visited Dec. 9, 2021).

32. The Deed of Trust provides that payment must be made in United States currency but does not specify the form in which payment must be made. Only in the event a check or other instrument is returned unpaid may the lender dictate that payment be made in a specific manner from the following list: "(a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer."[3] (*Id.*)

33. The Deed of Trust further provides for the Borrower's payment of "all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over [the] Security Instrument." (*Id.* ¶ 4.) Relatedly, "Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with [the] Loan." (*Id.*)

34. Moreover, the Deed of Trust outlines the limited circumstances under which the lender or servicer may charge the borrower fees: "Lender may charge Borrower for fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under [the] Security Instrument, including, but not limited to attorneys' fees, property inspection and valuation fees." (*Id.* ¶ 14.)

---

[3] "Electronic Funds Transfer" is defined in the Deed of Trust as "any transfer of funds, other than a transaction originated by check, draft or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." (Ex. 1, Definition L.) The definition specifically identifies "transfers initiated by telephone" as an example. (*Id.*)

### *SPS Charges Plaintiffs to Make Payments By Phone*

35. Although the Deed of Trust provides no basis for lenders or servicers to charge borrowers fees to make payments, SPS charged Plaintiffs each time they made payments by telephone.

36. Plaintiffs made mortgage payments by telephone 46 times between February 2017 and January 2021. SPS charged Plaintiffs $15 to make payments by telephone and Plaintiffs paid $15 on each of the following dates:

37. Upon information and belief, the fees charges by SPS did not pay for the service purportedly administered. That is, there was no basis for SPS to charge a fee for a pay-by-phone or online payment service because the service did not cost anything or did not cost the amount of the fee.

### *SPS Charges Plaintiffs for Inspection and Broker Price Opinion Fees*

38. The Deed of Trust allows lenders or servicers to charge fees for "property inspections" and "valuation fees," but only if those services are provided in connection with the borrower's default.

39. Generally, a servicer does not have to inspect a property that secures a delinquent mortgage unless there is no contact with the borrower and no payments have been made within the prior thirty days. *See*, Section 303 of the 2015 Fannie Mae Servicing Guidelines.

40. In spite of this guidance and the Deed of Trust's requirement that a borrower be in default and out of contact in order for a lender or servicer to charge property inspection or valuation fees, SPS repeatedly charged Plaintiffs default-related fees.

41. For example, SPS charged Plaintiffs $15 "Inspection Fees" and Plaintiffs paid those fees on four occasions when they were not in default.

8

42. SPS also charged Plaintiffs a $89 "BPO [Broker Price Opinion] Fee" which Plaintiffs paid.

43. SPS charged Plaintiffs those fees even though Plaintiffs were not in default at the time the purported inspections or broker price opinion took place.

### *RESPA Provides Additional Protections to Mortgage Loan Borrowers*

44. "RESPA is a remedial consumer protection statute and imposes obligations upon servicers of federally related mortgage loans." Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt 1024) [hereinafter 2013 Regulation X Amendments].

45. "Specifically, with respect to mortgage servicing, the consumer protection purposes of RESPA include responding to borrower requests and complaints in a timely manner, maintaining and providing accurate information, helping borrowers avoid unwarranted or unnecessary costs and fees, and facilitating review for foreclosure avoidance options." *Id.*

46. Consistent with these purposes, RESPA imposes mandatory duties on mortgage servicers in responding to borrower inquiries. 12 U.S.C. § 2605(e).

47. With respect to Qualified Written Requests, § 2605(e) requires the servicer to conduct an investigation and provide the borrower with a written explanation or clarification that includes: (1) the information requested by the borrower or an explanation of why the information requested is unavailable *and* (2) the name and telephone number of a servicer employee who can provide assistance to the borrower.

48. A servicer that fails to comply with the requirements of § 2605(e) is liable to the borrower for each failure for actual damages and, in the case of a pattern or practice of noncompliance, additional damages of up to $2,000. 12 U.S.C. § 2605(f).

49. These requirements and the corresponding civil liability were first added to RESPA in 1990 by the Cranston-Gonzalez National Affordable Housing Act as part of a broader effort to set a national housing policy so that every American family would be able to afford a decent home in a suitable environment. *See* Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101–625, §§ 101, 102, 941, 104 Stat 4079 (1990).

50. In responding to the 2007–2008 financial crisis, Congress further amended § 2605 to (1) increase penalties that servicers incur for violations of § 2605(e) and (2) authorize the Consumer Financial Protection Bureau to prescribe regulations that are appropriate to carry out RESPA's consumer protection purposes. *See* 2013 Regulation X Amendments, *supra* at 10709.

51. Thus, the protections in RESPA, including § 2605(e), were specifically designed to ensure that borrowers have timely access to accurate information regarding their accounts, that borrowers are able to avoid unnecessary fees and charges, and that borrowers are able to explore all available options to avoid foreclosure of their homes. *See id.*

52. RESPA's remedial nature provides a necessary incentive for mortgage servicers to comply with its requirements. *See* 2013 Regulation X Amendments, *supra* at 10701. Given the unique attributes of the servicing market, servicers are incentivized "to look for opportunities to impose fees on borrowers to enhance revenues." *Id.* The Bureau observed that servicers "earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements." *Id.* Thus, the imposition of civil liability on servicers for the damage caused by their violations of the requirements of RESPA is essential to achieve the statute's consumer protection purposes.

***Plaintiffs Sent SPS Qualified Written Requests***

53. Plaintiffs repeatedly informed SPS that they were charged excess fees in error, and SPS repeatedly failed to correct their account or provide requested information.

54. Plaintiffs submitted multiple Qualified Written Requests to SPS about the errors on their account, including on or about January 17, 2020 and March 12, 2020.

55. Both Qualified Written Requests were mailed to the address designated by SPS for qualified written requests.

56. The Qualified Written Requests asked SPS to refund the unlawful charges and explain why those charges were imposed.

57. The requests also specifically asked for documents and records about Plaintiffs' loan, including documents that would help explain the charges like transaction codes and invoices.

58. As of the date of filing, Plaintiffs have received a written response to only the January 17, 2020 Qualified Written Request. That response ignored Plaintiffs' primary concerns and explained only the accrual of late fees and how and when those fees could be assessed.

59. SPS refused to investigate its errors and completely disregarded the fact that: (1) Plaintiffs were not obligated to pay fees when making payments by phone; and (2) Plaintiffs were never in default and should not have been assessed any default-related charges.

60. SPS also rejected Plaintiffs' request for information explaining why they were being charged certain fees.

61. For example, SPS did not provide invoices for the pay-by-phone and default-related charges, as requested.

62. Plaintiffs, in turn, were hamstrung in their attempts to convince SPS that the fees should have been refunded and that no similar future fees should be charged.

## COUNT ONE:
### Breach of the Deed of Trust
### (Claim Against U.S. Bank)

63. Plaintiffs incorporate the preceding allegations.

64. A Deed of Trust is construed under Virginia law as a contract.

65. Additionally, like all contracts in Virginia, the Deed of Trust includes an implied covenant of good faith and fair dealing.

66. The Deed of Trust does not allow a borrower to be charged a fee to make a telephone or internet payment.

67. The Deed of Trust also provides that a borrower may be charged inspection fees and valuation fees only in the event of borrower default.

68. The Deed of Trust does not allow for the imposition of inspection fees and valuation fees when the borrower is not in default.

69. SPS, acting as U.S. Bank's agent, breach the Deed of Trust each time it charged Plaintiffs a fee to make a telephone or internet payment.

70. SPS, acting as U.S. Bank's agent, breached the Deed of Trust each time it charged Plaintiffs inspection fees or broker price opinion fees because Plaintiffs were not in default at the times those fees were charged.

71. U.S. Bank is liable for SPS's conduct.

72. SPS's breaches caused Plaintiffs to suffer economic damages for which U.S. Bank should be held liable. Accordingly, Plaintiffs seek their actual damages from U.S. Bank, including reimburse all of improper fees and charges assessed to their loan.

## COUNT TWO:
**Unjust Enrichment**
**(Individual Claim)**

73. Plaintiffs incorporate the preceding allegations.

74. Plaintiffs conferred a benefit on SPS when they paid fee for internet and telephone payments, inspection fees, and broker price opinion fees.

75. SPS retained Plaintiffs' payments even though no services were rendered in exchange for those payments or the charges vastly exceeded the actual cost of the services.

76. SPS knew or should have known that it was not entitled to internet and telephone payment fees or inspection fees and broker price opinion fees when Plaintiffs were not in default.

77. Because the fees were improper, it would be unjust for SPS to retain them.

78. Plaintiffs, therefore, are entitled to recover from SPS the amounts they paid to SPS in improper fees.

## COUNT THREE:
**Violation of RESPA, 12 U.S.C. § 2605(e)(2), Reg. X, 12 C.F.R. § 1024.36**
**(Plaintiffs' Claim against SPS)**

79. Plaintiffs incorporate the preceding allegations.

80. Plaintiffs' mortgage is a "federally related mortgage loan" under Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2602(1), in that it is secured by a first lien on residential real property designed for the occupancy of one to four families and the proceeds of it were used to purchase the secured property, and it was made by a lender whose deposits or accounts are insured by the FDIC and who is regulated by the Office of the Comptroller of the Currency.

81. Plaintiffs were borrowers and SPS was the servicer of the mortgage under 12 U.S.C. § 2605(e).

82. Plaintiffs submitted a Request for Information, as defined by Reg. X, 12 C.F.R. § 1024.36(a), in that it requested information that sufficiently identified Plaintiff's mortgage and properly specified information relating to the mortgage: the servicing notes in their records.

83. Plaintiffs' letters were sent to SPS's designated address for requests for information.

84. SPS failed to provide the requested account information, and upon information and belief, SPS failed to conduct the "reasonable search" for available information mandated by Reg. X, 12 C.F.R. § 1024.36(d)(1)(ii).

85. Because of SPS's refusal, Plaintiffs were deprived of their legal right to review account documents relating to charges that Plaintiffs believed to be unlawful.

86. As a result of SPS's repeated violations of 12 C.F.R. § 1024.36, Plaintiffs suffered concrete and particularized harm, including: informational injury, the incurring of attorneys' fees, the incurring of unnecessary fees and interest on their mortgage account, and emotional distress, including aggravation and stress.

87. Upon information and belief, this conduct was the result of SPS's standardized procedures in responding to requests for information. Therefore, upon information and belief, discovery will reveal evidence that many additional consumers were subject to the same or similar conduct by SPS.

88. Accordingly, SPS's conduct appears to be a pattern and practice of misconduct. As a result, SPS is liable to the Plaintiffs for statutory damages of up to $2,000 for each violation of 12 U.S.C. § 2605.

89. Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorneys' fees from SPS for each of its violations of 12 C.F.R. § 1024.36 in an amount to be determined by the Court under 12 U.S.C. § 2605(f).

### COUNT FOUR:
### Violation of RESPA, 12 U.S.C. § 2605(e)(2)(a), Reg. X, 12 C.F.R. § 1024.35(e)
### (Plaintiffs' Claim Against SPS)

90. Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

91. Plaintiffs' mortgage is a "federally related mortgage loan" under Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2602(1), in that it is secured by a first lien on residential real property designed for the occupancy of one to four families and the proceeds of it were used to purchase the secured property, and it was made by a lender whose deposits or accounts are insured by the FDIC and who is regulated by the Office of the Comptroller of the Currency.

92. Plaintiffs were borrowers and SPS was the servicer of the mortgage under 12 U.S.C. § 2605(e).

93. Plaintiffs' letters from January and March 2020 each constituted a Notice of Error under 12 C.F.R. § 1024.35 in that Plaintiffs notified SPS that it was charging them unlawfully for fees, including pay-by-phone fees and default-related fees.

94. Plaintiffs' letter was sent to SPS's designated address for notices of error.

95. Upon receipt of that Notice of Error, SPS had to conduct an investigation of the matters raised in the Notice of Error. *See* Reg. X, 12 C.F.R. § 1024.35(e).

96. Upon information and belief, SPS did not conduct an investigation under Reg. X, 12 C.F.R. § 1024.35(e). Had an investigation occurred, SPS would have discovered that the challenged fees were not permitted under the Deed of Trust.

97. SPS did not perform any investigation of the fees unlawfully charged to Plaintiffs and did not provide proof that the fees were charged lawfully.

98. Upon information and belief, this conduct was the result of SPS's standardized procedures in responding to notices of error. Therefore, upon information and belief, discovery will reveal evidence that many additional consumers were subject to the same or similar conduct by SPS.

99. Accordingly, SPS's conduct appears to be a pattern and practice of misconduct. As a result, SPS is liable to the Plaintiffs for statutory damages of up to $2,000 for each violation of 12 U.S.C. § 2605.

100. SPS's continued refusal to investigate these issues violates 12 U.S.C. § 2605(e)(2)(a).

101. Because of SPS's conduct, Plaintiffs' suffered concrete and particularized harm, including the incurring of unnecessary fees and interest on their account and emotional distress, including stress and aggravation.

102. Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorneys' fees from SPS for its violations of 12 U.S.C. § 2605(e)(2)(a) in an amount to be determined by the Court under 12 U.S.C. § 2605(f).

**WHEREFORE,** Plaintiffs request that the Court enter judgment against SPS for actual, statutory, and punitive damages as pled above; attorneys' fees, litigation expenses, and costs of suit; and any other relief that the Court finds appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL.**

Respectfully submitted,
**CESAR ALFARO and KARINA ALFARO**

By: _/s/ Kristi C. Kelly_

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
*Counsel for Plaintiffs*